**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Maurice HORTON, Defendant–Appellant.**

No. 95–3708.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1996.

Decided Oct. 21, 1996.

Gregory M. Gilmore (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Jon G. Noll, Jeffrey T. Page (argued), Springfield, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and ROVNER and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Maurice Horton pleaded guilty to making a bomb threat against a federal building in violation of 18 U.S.C. § 844(e). Horton made the threat only one day after a bomb had destroyed the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma. Relying heavily on that fact, the district court determined that Horton's was an unusual case warranting an upward departure of eight levels from the base offense level that otherwise would have been applicable to Horton's offense under the Sentencing Guidelines. The court also determined that a four-level reduction in base offense level for conduct demonstrating little or no deliberation pursuant to U.S.S.G. § 2A6.1(b)(2) was not appropriate under the facts of this case. The district court then sentenced Horton to 40 months in prison and three years of supervised release. *United States v. Horton,* 907 F.Supp. 295 (C.D.Ill.1995). The issues Horton has preserved on appeal include several challenges to his sentence, primarily directed at the extent of the upward departure assigned by the district judge under U.S.S.G. § 5K2.7, and the judge's denial of the four-level reduction for lack of appreciable deliberation. We agree with Horton that the eight-level upward departure was unreasonable in extent, and therefore vacate Horton's sentence and remand for resentencing. On remand, we leave open the question whether

Horton's threat was the product of "little or no deliberation" within the meaning of U.S.S.G. § 2A6.1(b)(2).

## I. BACKGROUND

On the morning of April 20, 1995, one day after a bomb destroyed the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma, killing 169 people, injuring many others, and causing extensive damage to several nearby buildings, Maurice Horton tried to enter the first floor of the Paul Findley Federal Building (Federal Building) in Springfield, Illinois. On that day, the Federal Building was under heightened security, and all persons seeking to enter it were required to present proper identification. Upon being asked by the security guard to identify himself, Horton became agitated. Although the record does not reflect what happened next, it seems likely that Horton was denied entry. Several hours later, at approximately 12:30 p.m., a local television newswoman who was reporting on the increased security measures noticed Horton loitering in the immediate vicinity of the Federal Building. From 12:30 p.m. until about 12:45 p.m., Horton spoke with a man named Larry Davis, who was also standing nearby. During that conversation, Horton gave no indication that he might be thinking about making a bomb threat. A short time thereafter, at about 1:00 p.m., Horton entered the Springfield Municipal Building, which is located directly across the street from the Federal Building. Horton went to the office of the Mayor of Springfield and asked the Mayor's secretary, Kimberly McGee, whether he could speak with the Mayor. When McGee told Horton that the Mayor was not available, Horton replied, "Tell the Mayor that there has been a bomb threat at the Federal Building and they closed the door." Horton then added, "I hate you," as he left the office.

Several minutes later, at 1:09 p.m., Court Security Officer Darrell W. Martin received a bomb threat, communicated by telephone to the office of the United States Marshall's Service. The caller stated that an explosive device had been placed in the Federal Building and that it would "go off in fifteen minutes." Telephone company records show that the call originated from a public telephone located on the third floor of the Springfield Municipal Building. A witness observed Horton standing next to the telephone and looking through the telephone book at about the same time that the threat was received. Horton's fingerprints were later recovered from the page of the telephone book that contained the number of the United States Marshall's Service. The bomb threat resulted in the immediate evacuation of the Federal Building, and was followed by an exhaustive search for the device. The search was conducted by officers from several federal, state and local law enforcement agencies and lasted for the remainder of the day. A total of 123 federal employees and many members of the public were required to leave the Federal Building, and fourteen federal agencies remained closed until the following morning. No explosive device was found.

While the search was taking place, Horton voluntarily spoke to several FBI agents interviewing members of the public who had been in the vicinity of the Federal Building at the time of the threat. Horton stated that he had used the public telephone on the third floor of the Springfield Municipal Building just before noon, but emphatically denied using the telephone after that time. Horton also made several rather unusual remarks to the agents, acknowledging that he knew he was considered "public enemy number one" in Springfield, and that he expected to be treated as a suspect in the case. Yet Horton continued to insist that he was not involved in making the bomb threat. At approximately 4:30 p.m. of the same afternoon, Horton was arrested for making the threat.

On May 4, 1995, a federal grand jury returned a two-count indictment against Horton, charging him with making a bomb threat against the Federal Building in violation of 18 U.S.C. § 844(e) (Count 1), and making a false statement to a federal officer in violation of 18 U.S.C. § 1001 (Count 2). Horton initially pleaded not guilty and requested that the district judge presiding over this case recuse himself on the grounds that he had been a victim of the bomb threat and

thus was not, and could not reasonably be expected to be, unbiased. 28 U.S.C. §§ 144, 455(a). The district court denied Horton's request. Horton then entered into a written plea agreement with the government pursuant to Rule 11(e)(1)(A), agreeing to plead guilty to Count 1, making the bomb threat. The government, in turn, agreed to dismiss Count 2 of the indictment. Although the plea agreement advised Horton that he faced a statutory maximum sentence of five years, the government nevertheless recommended a four-level reduction in base offense level for minimal deliberation (U.S.S.G. § 2A6.1(b)(2)) and a two-level reduction for acceptance of responsibility (U.S.S.G. § 3E1.1(a)). The government also suggested that Horton's conduct did not warrant an increase in base offense level for obstruction of justice (U.S.S.G. § 3C1.1), but that the district court should consider an upward departure from the resulting base offense level because Horton's threat had resulted in "a significant disruption of a governmental function," U.S.S.G. § 5K2.7. The government further recommended that the upward departure be limited to three levels. Horton understood, of course, that the district court would not be bound by any of the government's sentencing recommendations.

The district judge accepted Horton's guilty plea and ordered the preparation of a presentence report. As part of the report, the judge ordered several mental health agencies that had treated Horton in the past to turn over their records of Horton's diagnosis and treatment. At sentencing, the judge rejected the recommendations of both the government and the Probation Department concerning the appropriate base offense level to assign to Horton under the Sentencing Guidelines. The judge began with an offense level of 12 as provided by U.S.S.G. § 2A6.1, then deducted two levels for acceptance of responsibility. The judge refused, however, to apply the recommended four-level reduction for minimal deliberation. The judge reasoned that, rather than engaging in a spur-of-the-moment prank, Horton had had time to reflect on his course of action before making the threat, and had decided to exploit the government's "heightened fear of terrorist attacks" for maximum impact. 907 F.Supp. at 298. The district judge further determined that an upward departure of eight levels would be appropriate given the grave nature and the unfortunate timing of Horton's bomb threat. *Id.* at 300–01. The court thus calculated Horton's sentence on the basis of an offense level of 18 rather than 10. Because Horton's criminal history (which included an assault conviction for threatening a Springfield alderman in 1991) placed him in category III, this calculation yielded a sentencing range of 33 to 41 months, as compared with a range of 10 to 16 months absent any upward departure. The judge then sentenced Horton to 40 months in prison and three years of supervised release, and imposed special conditions of supervision in light of Horton's psychiatric history.

## II. DISCUSSION

■ Horton first challenges the district judge's denial of his request that the judge recuse himself, which Horton originally brought on the grounds that Judge Mills, whose court is located in the Federal Building, was a victim of the bomb threat and is therefore biased against him (28 U.S.C. § 144), and that in any case, a reasonable person would be led to question the judge's impartiality in light of these facts (28 U.S.C. § 455(a)). On appeal, however, Horton has abandoned his claim that Judge Mills was actually biased against him, and has confined his argument to the issue of whether a reasonable person would doubt the judge's ability to maintain an impartial view of this case. In other words, Horton has focused entirely on whether the judge should have recused himself under section 455(a), rather than section 144. Although the denial of a motion for mandatory recusal under section 144 need not be appealed immediately, and is not waived when the defendant pleads guilty, *United States v. Troxell*, 887 F.2d 830, 833 (7th Cir.1989); *see also United States v. Gipson*, 835 F.2d 1323 (10th Cir.), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 623 (1988), the denial of a request that the judge recuse himself under section 455(a) must be appealed immediately by application for writ of mandamus, or it is waived. *E.g.*, *United States v. Balistrieri*, 779 F.2d 1191,

1205 (7th Cir.1985), *cert. denied*, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986). By failing to apply for a writ of mandamus at the time his request was denied, Horton has waived his challenge to the judge's refusal to recuse himself pursuant to 28 U.S.C. § 455(a).

Horton next challenges the district court's decision to depart upward by eight levels from the applicable guideline range on the ground that the bomb threat severely disrupted the work of the fourteen federal agencies housed in the Federal Building. *See* U.S.S.G. § 5K2.7. Although Horton agrees that an upward departure pursuant to section 5K2.7 was warranted, he maintains that a departure of one or two levels would have been appropriate, pointing to the fact that the Probation Department also recommended a two-level upward departure, and that the government only requested a three-level departure. Given that the government and the Probation Department both agreed that he should receive a relatively modest upward departure, Horton assails the reasonableness of the extent of the departure imposed by the district court. *See* 18 U.S.C. § 3742(e)(3), (f)(2). Horton further contends that the departure he received far exceeds that generally seen in the prevailing case law, and advises us that the term of imprisonment he must serve (40 months) is two years longer than the longest possible sentence he could have received absent the departure, even assuming that the district judge did not err in denying him a four-level reduction for little or no deliberation under U.S.S.G. § 2A6.1(b)(2).

▮ A district judge's determination of the extent of an upward departure, designed to take into consideration the unique factual circumstances of the atypical case, is by nature a discretionary decision. Yet every departure from the Sentencing Guidelines must be "reasonable" in extent. *United States v. Ferra*, 900 F.2d 1057, 1061 (7th Cir.1990); 18 U.S.C. § 3742(e)(3), (f)(2). As the Supreme Court observed in *Williams v. United States*, "[t]he reasonableness determination looks to the amount and extent of the departure in light of the grounds for departing." 503 U.S. 193, 203, 112 S.Ct. 1112, 1121, 117 L.Ed.2d

341 (1992). Although we have recognized the impossibility of formulating precise rules for determining whether the extent of an upward departure is reasonable, *see Ferra*, 900 F.2d at 1062, this court and others have approved of a method that involves calculating the defendant's sentence by analogy to existing guideline provisions. Thus, a district court determines the extent of an upward departure by comparing the seriousness of the aggravating factors that motivate the departure with the adjustments in base offense level prescribed by the guideline provisions that apply to conduct most closely analogous to the defendant's offense conduct. *See id.* at 1061–62; *United States v. Sablan*, 90 F.3d 362, 365 (9th Cir.1996); *United States v. Lira–Barraza*, 941 F.2d 745, 748–49, 751 (9th Cir.1991) (*en banc*); *United States v. Puello*, 21 F.3d 7, 10 (2d Cir.1994); *United States v. Cherry*, 10 F.3d 1003, 1013 (3d Cir.1993) (relying on *United States v. Kikumura*, 918 F.2d 1084, 1113 (3d Cir.1990)); *United States v. Gary*, 18 F.3d 1123, 1131 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 134, 130 L.Ed.2d 77 (1994); *United States v. Roth*, 934 F.2d 248, 252 (10th Cir.1991), *cert. denied*, 506 U.S. 1026, 113 S.Ct. 672, 121 L.Ed.2d 595 (1992). By linking the extent of the departure to the structure of the Guidelines in this way, a district court avoids the types of large disparities in sentencing that the Guidelines were designed to prevent, and gives the appellate court a basis for conducting a principled review of the reasonableness of the extent of the departure. *See Ferra*, 900 F.2d at 1062; *see also United States v. Newman*, 965 F.2d 206, 213 (7th Cir.), *cert. denied*, 506 U.S. 976, 113 S.Ct. 470, 121 L.Ed.2d 377 (1992); *Lira–Barraza*, 941 F.2d at 749–50; *Gary*, 18 F.3d at 1131.

Horton does not claim that the district court relied on impermissible factors or erroneous factual findings to justify the departure, *cf. Koon v. United States*, —— U.S. ——, —— – ——, 116 S.Ct. 2035, 2045–46, 135 L.Ed.2d 392 (1996); 18 U.S.C. § 3742(e); indeed, Horton agrees that some degree of departure was obviously warranted under U.S.S.G. § 5K2.7, which encourages an upward departure if the defendant's conduct "resulted in a significant disruption of a governmental function." Because all parties

agree that the district court relied on permissible or encouraged factors in deciding to depart, and that the factors it considered were "of a kind or a degree not adequately taken into consideration" by the guidelines, *see Koon*, —— U.S. at ——, 116 S.Ct. at 2044 (citing 18 U.S.C. § 3553(b)), we shall only examine whether the extent of the departure assigned by the court was reasonable.

■ Under section 5K2.7, if a defendant's conduct significantly disrupted a governmental function, the sentencing court is encouraged to increase the defendant's sentence "above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected." U.S.S.G. § 5K2.7. The serious impact of Horton's threat on the functioning of the fourteen federal agencies housed in the Federal Building, their employees, and the members of the public who rely on them, as well as the law enforcement officials who searched for the nonexistent explosive, led the district judge to conclude that an upward departure from the applicable guideline was warranted. 907 F.Supp. at 300–01. The judge then arrived at an upward departure of eight levels by considering the six-level enhancement provided in the guideline that directly applies to threatening communications accompanied by conduct indicating that the defendant intends to carry out his threat, section 2A6.1(b)(1), and adding two more levels on the basis of the guideline provisions that authorize upward adjustments for unusual vulnerability of the victim (section 3A1.1(b)), obstruction of justice (section 3C1.1), and offense conduct that involves specifically targeting government officers or employees as victims (section 3A1.2(a)). *Id.* According to the judge's rationale, any one of these latter upward adjustments provided a sufficient reason to support an additional two-level departure beyond the six levels provided in U.S.S.G. § 2A6.1(b)(1). *Id.*

Thus, we see that in the district court's view, the disruption caused by the bomb threat merited an upward departure even greater than the six-level enhancement provided in U.S.S.G. § 2A6.1(b)(1), which is reserved for defendants whose conduct "evidenc[es] an intent to carry out [the] threat."

Yet as all parties agree, Horton did not engage in any conduct that demonstrated an intent to plant an explosive device in the Federal Building. Although we acknowledge that the inauspicious timing of the threat led those who were affected by Horton's conduct to take the threat very seriously, and that the disruption that ensued was substantial, we also bear in mind that Horton's conduct created no risk whatsoever that the occupants of the Federal Building would be injured by an explosive. Nor did any aspect of Horton's conduct indicate that Horton might have intended such an outcome. Given the difficulty inherent in comparing offense conduct that is aimed at creating a risk of actual injury to its victims, as evidenced by behavior consistent with the defendant's intent to carry out his threat, with the disruption resulting from a threat that was entirely empty, we cannot agree that the judge chose an appropriate analogy for determining the extent of the upward departure in this case.

■ Moreover, as this court observed in *Ferra*, because the Sentencing Commission prescribes two-level adjustments for relatively serious offense characteristics, upward departures of more than two levels should be explained "with a care commensurate with their exceptional quality." 900 F.2d at 1064. The district court did not, however, explain why it considered section 2A6.1(b)(1) to provide a sound analogy for the purpose of assessing the degree of disruption caused by Horton's conduct. Instead, the district court justified its reliance on that guideline subsection as one basis for the departure by stating that "[a] departure of 6 offense levels mirrors the only enhancement specifically listed in § 2A6.1." 907 F.Supp. at 301. Yet as we have already discussed, the six-level enhancement provided in section 2A6.1(b)(1) applies to conduct of a significantly different character than that engaged in by Horton. The court's reason for comparing Horton's conduct to the offense characteristics described in a guideline enhancement that applies only to conduct that goes beyond the bounds of making an empty threat, and involves taking a step that demonstrates the defendant's willingness to carry out his threat, thus remains opaque.

Of course, the district judge did provide a general explanation for his decision to depart when he noted that Horton's threat against the Federal Building in Springfield followed in the wake of the massive explosion that devastated the Alfred P. Murrah Federal Building, and was thus acutely disruptive because of its timing. Yet this type of global justification does not address the separate issue of the reasonableness of the extent of the upward departure the court actually imposed. *See United States v. Akindele,* 84 F.3d 948, 953–55 (7th Cir.1996); *United States v. Hogan,* 54 F.3d 336, 341–42 (7th Cir.1995); *see also Sablan,* 90 F.3d at 365; *Roth,* 934 F.2d at 251–52. As we explained in *Akindele,* in computing the degree of an upward departure, the district court is "required to articulate the specific factors justifying the extent of [the] departure and to adjust the defendant's sentence by utilizing an incremental process that quantifies the impact of the factors considered by the court on the … sentence." 84 F.3d at 954–55 (internal quotations omitted). As we have seen, in the present case the court made only a passing reference to the six-level enhancement provided in section 2A6.1(b)(1) as its starting point for determining the extent of the upward departure, without explaining what specific factors had lead it to conclude that the guideline was an appropriate benchmark for assessing the severity of the disruption created by Horton's threat. In view of the scant grounds the district court has articulated for imposing an upward departure of this magnitude, we are unable to conclude that the departure was reasonable.

■ The dissent, however, contends that the Supreme Court's decision in *Koon* "alters the landscape" of appellate review of district courts' departure decisions, and calls into question "all of our earlier departure jurisprudence." (*Post* at 321.) The dissent then suggests that all but the most conspicuously irrational departure decisions should from now on be routinely upheld. (*Post* at 321.) We do not read *Koon* to require that we abdicate our reviewing authority over the magnitude of a departure chosen by the district court. As noted at the outset, our authority to review the district judge's departure decision in Horton's case stems from

section 3742(e)–(f), which provides for appellate review of the reasonableness of the extent of any departure assigned by the district court, an issue quite separate from the court's decision whether to depart at all. Although *Koon* changed the standard of review with respect to the latter issue, — U.S. at —— ——, 116 S.Ct. at 2046–48, and adopted a unitary abuse of discretion standard for the review of departure decisions, *id.* at —— ——, 116 S.Ct. at 2047–48, we do not believe that it subverted our rationale for requiring a district court to explain its reasons for assigning a departure of a particular magnitude in a manner that is susceptible to rational review. *See, e.g., Ferra,* 900 F.2d at 1061–62. Indeed, we view this requirement as indispensable to furthering the "fundamental goal of the Sentencing Reform Act, which is to place federal sentencing on an objective, uniform, and rational (or at least articulable, *nonintuitive*) basis," *United States v. Pullen,* 89 F.3d 368, 371 (7th Cir. 1996) (emphasis added), a goal that is not jettisoned merely because a particular offense merits a departure from the Guidelines. Because this requirement does not deprive the district judge of the deference to which he is due, we do not believe it to be inconsistent with *Koon,* — U.S. at —— ——, 116 S.Ct. at 2047–48; *see, e.g., Sablan,* 90 F.3d at 365 (district court abuses discretion by not adequately linking extent of departure to structure of Guidelines).

Horton also challenges the district court's denial of a four-level reduction pursuant to U.S.S.G. § 2A6.1(b)(2). Under that guideline subsection, a defendant convicted of making a threatening communication who did not engage in any conduct that would indicate an intent to carry out the threat, and whose offense involved only "a single instance evidencing little or no deliberation," may be granted a four-level reduction in his base offense level. U.S.S.G. § 2A6.1(b)(2). Although the government and the Probation Department both recommended the four-level reduction, the district judge declined to apply the reduction on the ground that Horton had had ample time to think about whether to make the bomb threat, and that in making the threat one day after the Okla-

homa City bombing, Horton "clearly took advantage of the [government's] heightened fear of terrorist attacks." 907 F.Supp. at 298. The judge also concluded that because Horton had been seen in or near the Federal Building earlier that day, Horton had been contemplating the threat for at least 39 minutes, and possibly for more than two hours. *Id.*

In denying the four-level reduction, the district court again offered a global justification for concluding that Horton deliberated about whether to make the threat for a good part of that morning, primarily basing its reasoning on the unfortunate timing of Horton's threat against the Federal Building. Because Horton was present at the Federal Building, and was aware of the heightened security measures that had been adopted there, the district court inferred that Horton must have been deliberating about whether to make the threat for some length of time prior to actually making it. Although it is certainly conceivable that Horton was weighing the pros and cons of whether to make the threat several hours before he did so, we are nevertheless troubled by the speculative nature of the court's conclusion in this regard, and particularly so because the court has chosen to dismiss without comment the fact that during part of the time that Horton was seen in the vicinity of the Federal Building, he was talking to another bystander about matters that apparently had nothing to do with the bomb threat. We are also troubled by the brief attention the district court gave to examining whether Horton's offense conduct was of a nature that would require more than "little or no deliberation" to accomplish. *Cf. United States v. Sanders,* 41 F.3d 480, 483–85 (9th Cir.1994) (district court should closely examine offense conduct to determine whether it was likely to have resulted from more than minimal deliberation), *cert. denied,* —— U.S. ——, 115 S.Ct. 2010, 131 L.Ed.2d 1009 (1995). We therefore conclude

that the issue whether Horton should receive the four-level reduction pursuant U.S.S.G. § 2A6.1(b)(2) would benefit from a more thorough analysis upon remand. Horton's sentence is vacated, and this case is remanded for resentencing in accordance with this opinion.[1] Circuit Rule 36 shall apply.

VACATED and REMANDED.

TERENCE T. EVANS, Circuit Judge, dissenting.

It's hard to imagine that when the federal sentencing guidelines became law, anyone thought appellate courts would tinker with sentences to the degree that they do today. After all, during our nation's entire history, trial judges imposed sentences (cabined only by maximum terms prescribed by law) with, for all practical purposes, unlimited discretion. Appellate courts, during all those years, were rarely involved in sentencing, which was viewed as a unique, intensely personal, and often fact-specific process that did not lend itself to micromanagement from afar. But today, almost nine years after the federal sentencing guidelines became effective, appellate courts routinely fine-tune sentences. The willingness, and in some cases eagerness, to tread in this area encourages more appeals (rarely today is a criminal case appealed without a few sentencing issues), leads to more uncertainty in the district courts, and unduly complicates and elongates sentencing proceedings. This case is a good example of one where we should not be tinkering with the work of the district court.

This case is a bit unusual because both the government and Maurice Horton agree that an upward departure under § 5K2.7 is justified. In the plea agreement the government agreed to suggest a 3–level upward move. Judge Mills thought 8 levels, under the unique facts of the case, was called for. With a base offense level of 12, an unchal-

---

1. Horton also objected to the use of his psychiatric records by the court when it imposed special conditions of supervised release, contending that the district judge wrongly ordered the production of his psychiatric records in violation of his psychotherapist-patient privilege under Federal Rule of Evidence 501. Since the district court's subpoena of those records, the Supreme Court has decided *Jaffee v. Redmond,* —— U.S. ——, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), recognizing a federal privilege for confidential communications made between a patient and his psychotherapist. We leave it to the district judge to determine in the first instance whether *Jaffee* applies to this case.

lenged 2–level deduction for acceptance of responsibility, and an admitted criminal history category of III, the range selected by the judge's computations was 33 to 41 months.[1] The range with a 3–level bump would have been 18 to 24 months. The judge imposed a term of 40 months, 16 months more than the top of the rejected range.

The guideline for making a bomb threat (U.S.S.G. § 2A6.1—"Threatening Communications") is purposefully vague. The Application Note says:

> The Commission recognizes that this offense includes a particularly wide range of conduct and that it is not possible to include all of the potentially relevant circumstances in the offense level. Factors not incorporated in the guideline may be considered by the court in determining whether a departure from the guidelines is warranted.

Here, the district court, in a thorough decision—see *United States v. Horton*, 907 F.Supp. 295—selected a range that allowed for an enhanced sentence based primarily on the timing of Horton's threat that a bomb was going to blow the Findley Federal Building to smithereens. Judge Mills reasoned that Horton's threat, coming just one day after the Murrah Federal Building in Oklahoma City was blown away, justified a longer sentence than the one contemplated in the plea agreement or the guidelines without a major upward departure. The majority says Judge Mills engaged in a "type of global justification" that did not "address the separate issue of the reasonableness of the extent of the upward departure the court actually imposed." I can't agree. As I read the judge's decision, he fully explained why he selected the sentence imposed and adequately justified—globally or otherwise—his choice.

Finally, I find the majority's treatment of this issue to be inconsistent with the recent reasoning of the Supreme Court which, viewing the problem globally, thought appellate courts should give more deference to trial judges who depart under the guidelines.

*Koon v. United States*, —— U.S. ——, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), in my view greatly alters the landscape of appellate review of departures under the guidelines. *Koon* tells appellate courts to dump their *de novo* review of departures and adopt, instead, a deferential "abuse of discretion" standard. In my view, this monumental change alone casts a pall over all of our earlier departure jurisprudence. Because Horton timed his threat to be particularly effective in the wake of Oklahoma City (you can bet those who bailed out of the federal building in Springfield were very fearful), his act was outside the "heartland" of typical bomb scare cases. Because the reason for the departure—a significant disruption of a governmental function—is not a forbidden or discouraged reason for departure but instead is an encouraged factor, and because the district judge gave a reasoned explanation for his decision that we should honor because it's not totally wacky, the decision should be affirmed. And from now on, all departures by district courts under the guidelines— whether up or down—should in my view be treated with more respect by federal courts of appeals.

---

**1.** To avoid complicating the arithmetic of the matter, I'll not mention the rejected deduction under U.S.S.G. § 2A6.1(b)(2) which the majority leaves open for consideration on remand by a new judge. Suffice to say, however, that I disagree with that result.